IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**ELIZABETH A. FOSTER and**
**JERRY FOSTER,**

     **Plaintiffs,**

vs.                                               **No. CIV 03-1243 RB/KBM**

**LOCO CREDIT UNION, GEORGE**
**ELIZONDO, DAVID OLSEN, CHARLES**
**MONTJOY, JOHN JENKINS, MICHAEL**
**FARLEY, KENT HOUSE, and DAVID**
**JOHNSON,**

     **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendants' Motion for Summary Judgment (Doc. 42), filed June 28, 2004. Plaintiffs ("the Fosters") filed a complaint alleging bankruptcy discrimination in violation of 11 U.S.C. § 525(b), retaliatory discharge, civil conspiracy, and loss of consortium in the Seventh Judicial District, County of Sierra, State of New Mexico. On October 29, 2003, Defendants removed the matter to this court pursuant to 28 U.S.C. §§ 1441 and 1446. Jurisdiction is founded upon 28 U.S.C. § 1331. Having considered the submissions of the parties, relevant law, and being otherwise fully advised, I find that this motion should be denied in part, and granted in part.

**I.**    **Facts.**

The following statement of facts is set forth in the light most favorable to the Fosters, with all reasonable inferences from the record drawn in their favor. *See Clanton v. Cooper*, 129 F.3d 1147, 1150 (10th Cir. 1997). LOCO Credit Union ("LOCO") is subject to regulatory oversight by the National Credit Union Association ("NCUA") and the Financial Institutions Division ("FID") of

the New Mexico Licensing and Regulation Department. (Undisputed Material Facts ¶ 1.) LOCO provides services primarily for educators and their families in Alamogordo and surrounding counties. (Undisputed Material Facts ¶ 2.) LOCO is managed by a volunteer, seven-member Board of Directors ("Board"). (Undisputed Material Facts ¶ 3.) During the events underlying this lawsuit, the Board consisted primarily of professional educators, most of whom had no professional training or experience in financial management or the operations of a credit union. (Undisputed Material Facts ¶ 4.)

Ms. Foster served as Chief Executive Officer ("CEO") of LOCO from June 1, 2001 until November 1, 2002. (Undisputed Material Facts ¶ 5.) As CEO, Ms. Foster was responsible for the day-to-day operations of LOCO. (Depo. of Ms. Foster, Defs. Ex. G at 165.) At the time she became CEO in 2001, Ms. Foster recognized that LOCO was on probationary status and that its performance was only marginal and suffered from financial and other problems created, in part, by general economic and market conditions. (Defs. Ex. G at 77-79.)

As part of their regulatory functions, the NCUA and FID issue ratings as an evaluation of a credit union's capital, asset quality, management, earnings, and liquidity. (Undisputed Material Facts ¶ 7.) These ratings are known as "CAMEL" ratings. (*Id*.) CAMEL ratings range from 1 to 5, with 1 reflecting a better performance than 5. (*Id*.) Ms. Foster knew that a CAMEL rating of 4 or 5 could "close your doors" and that a rating of 3 indicated marginal performance necessitating annual reporting, monitoring, and visitation. (Defs. Ex. G at 72.)

As of July 31, 2001, LOCO's CAMEL ratings were as follows:

    Capital              3
    Asset Quality    2
    Management     2

| | |
|---|---|
| Earnings | 5 |
| <u>Liquidity</u> | <u>2</u> |
| **Total** | **14** |
| **Composite** | **3** |

(Defs. Ex. I.)

Ms. Foster understood that she was responsible for taking action to improve the credit union's financial status. (Defs. Ex. G at 108.) At her first board meeting as CEO in July 2001, Plaintiff told the Board that LOCO's performance would take twelve to eighteen months to turn around. (Defs. Ex. G at 77.)

In May 2002, the Fosters decided to discharge their debts in bankruptcy. (Defs. Ex. G at 137.) In June or July 2002, the Fosters signed off on the final bankruptcy paperwork. (Defs. Ex. G at 139.)

In late July and early August 2002, regulatory examiners spent approximately nine days conducting an on-site visitation and examination of LOCO. (Defs. Ex. G at 112.) In an email to Board members, dated August 13, 2002, Ms. Foster characterized the tone of the exit interview as "very serious," and stated that an examiner was justified in giving the credit union a CAMEL rating of 3, 4, or 5. (Defs. Ex. K.) The examiners met with LOCO's Board on August 14, 2002 to discuss their findings. (Defs. Ex. L.) The examiners stated that they had been inclined to give an overall rating of 4 and impressed upon the Board the urgency to act in response to their findings. (Defs. Ex. L.)

On September 9, 2002, the FID submitted its report of examination. (Defs. Ex. N.) The letter submitted with the report stated that the overall condition of LOCO was unsatisfactory. (Defs. Ex. G at 124.) The letter further noted that LOCO's "level of earnings, asset quality, Asset/Liability

Management, and Allowance for Lease and Loan Losses reflect poorly on the management of the credit union" and that "little, if any, progress had been made since the previous examination." (Defs. Ex. G at 124; Defs' Ex. N.) The letter admonished the Board to "promptly implement remedial measures to cure these weaknesses to assure viability and profitable operation of the credit union in a safe and sound manner." (Defs. Ex. N.) Ms. Foster understood that her termination could be among the measures called for to address the deficiencies detailed in the September 9, 2002 examination report. (Defs. Ex. G at 125.)

For the period of July 31, 2001 through June 30, 2002, LOCO's CAMEL ratings were as follows:

| | |
|---|---|
| Capital | 2 |
| Asset Quality | 3 |
| Management | 4 |
| Earnings | 5 |
| <u>Liquidity</u> | <u>4</u> |
| **Total** | **17** |
| **Composite** | **3** |

(Defs. Ex. I.)

Although the Fosters had signed off on the bankruptcy paperwork in June or July 2002, the petition had not been filed as of September 18, 2002. (Defs. Ex. G at 125.) On September 18, 2002, Ms. Foster informed Board Chairman George Elizondo of her anticipated bankruptcy. (Defs. Ex. G at 94.) Elizondo told Ms. Foster that the bankruptcy "wasn't a concern" and there was "no reason even to consider" a resignation because of the anticipated bankruptcy. (Defs. Ex. G at 94; 156-157.)

On October 8, 2002, Foster and her husband filed for bankruptcy. (Defs. Ex. G at 21.) On October 8, 2002, the Board met without Ms. Foster in a special meeting, before the general board meeting. (Defs. Ex. G at 152.) Ms. Foster avers that the purpose of the special meeting was for

Elizondo to inform the Board that the Fosters had filed for bankruptcy. (Pls. Ex. C ¶ 4.) To her knowledge, the purpose of the special meeting was not to review the examination report. (*Id.*) During the special meeting, the Board decided to terminate Ms. Foster. (Defs. Ex. B at 24, Ex. C. at 14, Ex. D at 56, and Ex. E at 19.) Ms. Foster attended the regular board meeting on October 8, 2002, where the examination report was discussed. (Pls. Ex. C ¶ 4.)

On October 9, 2002, Elizondo suggested that Ms. Foster resign. (Pl. Ex. C ¶ 1.) Elizondo told Ms. Foster that the Board wanted to know if there was any way to avoid the bankruptcy filing and that they did not want her to leave. (Defs. Ex. G at 157.) Ms. Foster told Elizondo that the petition was filed on the previous day. (Defs. Ex. G at 158.) Elizondo told Ms. Foster that the Board was afraid that teachers would talk too much if she had filed for bankruptcy and he would have to get back with the Board. (*Id.*) Ms. Foster understood that a final decision to terminate her had not been made because Elizondo had to discuss it with the Board. (Pls. Ex. C ¶ 2.)

On October 15, 2002, Elizondo gave Ms. Foster a termination letter, dated October 10, 2004. (Pls. Ex. C ¶ 3.) The letter stated that Ms. Foster was being terminated because LOCO was not moving in a positive direction, any positive movement was marginal at best, improvement in certain areas was negligible, LOCO was still in probationary status, and it was in the same status as when Ms. Foster became CEO. (Pls. Ex. 1.) When Plaintiff told Elizondo that the stated reasons were false, Elizondo agreed and he stated that the wording of the letter was the result of a consultation with a lawyer. (Pls. Ex. C ¶ 3.)

On September 22, 2003, the Fosters filed suit in state court, alleging that (1) Ms. Foster was terminated solely because she filed for bankruptcy in violation of 11 U.S.C. § 525(b), (2) retaliatory discharge, (3) conspiracy to commit the tort of retaliatory discharge, and (4) loss of consortium for

5

Mr. Foster. (Compl.) Defendants removed the case to this court on October 29, 2003.

**II.     Standard.**

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" *Muñoz v. St. Mary Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting Rule 56(c)). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id*.

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (*quoting First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the non-moving party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999).

**III.     Analysis.**

    **A.     Motions to Strike.**

In their Response to Defendants' Motion for Summary Judgment, the Fosters move to strike Defendants' Exhibits H, I , J, K, L, M, N, and Q as inadmissible hearsay. Only admissible evidence may be considered when ruling on a motion for summary judgment. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F. 2d 1467, 1474 (10th Cir. 1985). When analyzing a summary judgment motion, a court must consider pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . FED. R. CIV. P. 56 (c). Supporting and opposing affidavits must be based on personal knowledge and set forth such facts as would be admissible in evidence and show affirmatively that the affiant is competent to testify on the matters stated in the affidavit. FED. R. CIV. P. 56 (e).

Defendants initially submitted Exhibits H, I , J, K, L, M, N, and Q without an authenticating affidavit. However, Defendants attached an affidavit from Sandra Powell, CEO of LOCO, that is based on personal knowledge and demonstrates that the documents in question would be admissible under a hearsay exception. (Defs' Reply in Supp. of Defs' Mot. for Summ. J., Ex. A.) Therefore, the Fosters' motion to strike will be denied.

In their Reply, Defendants object to Fosters' counsel's affidavit and correspondence between counsel that Plaintiffs attached to their Response. The Fosters assert that Exhibit Q, the October 8, 2002 general board meeting minutes, is a recent fabrication because it was not produced and not mentioned in pretrial correspondence. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 8.) The affidavit and correspondence are based on personal knowledge and may be admissible under the Federal Rules of Evidence. Defendants' objections will be overruled. The issue of whether Exhibit Q was recently

fabricated need not be resolved at this time because it does not affect the outcome of the motion.

### B. Whether the Fosters can prove that Ms. Foster was terminated solely due to the bankruptcy.

Section 525(b) provides:

No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt--
(1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;
(2) has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or
(3) has not paid a debt that is dischargeable in a case under this title or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525(b) (emphasis added).

The plain meaning of the statute requires that the plaintiff show that the bankruptcy was the sole reason for the termination. "[A] cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotations and citations omitted). Where the language of a statute is "clear and unambiguous, then the plain meaning of the words must be given effect." *United States v. La Cock*, 366 F.3d 883, 888 (10th Cir. 2004). A fundamental element of a Section 525(b) claim is that the insolvency, the filing of bankruptcy, or the discharge of a debt is the sole reason for discriminatory treatment by an employer. *Laracuente v. Chase Manhattan Bank*, 891 F.2d 17, 23 (1st Cir. 1989); *Stockhouse v. Hines Motor Supply, Inc.*, 75 B.R. 83, 85 (D. Wyo.1987). A "plaintiff's claim is defeated by a showing that his bankruptcy status was not the sole reason for his termination." *Stockhouse*, 75 B.R. at 85.

The Fosters do not dispute that they must show that the bankruptcy was the sole reason for

8

Ms. Foster's termination. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 7.) They argue that there is a fact issue about whether the bankruptcy was the sole reason for the termination. The record, taken in the light most favorable to the Fosters, supports their argument.

The examiners met with the Board on August 14, 2002 and informed the Board of the deficiencies at LOCO. On September 9, 2002, the examiners submitted their report to the Board. On September 18, 2002, Ms. Foster informed Elizondo of her anticipated bankruptcy. Elizondo told Ms. Foster that the bankruptcy "wasn't a concern" and there was "no reason even to consider" a resignation because of the anticipated bankruptcy. These statements could be construed as an indication that there were no plans to terminate Ms. Foster based on LOCO's performance.

On October 8, 2002, Elizondo informed the Board that the Fosters had filed for bankruptcy. During the October 8, 2002 special meeting, the Board decided to terminate Ms. Foster. On October 9, 2002, Elizondo told Ms. Foster the Board wanted to know if there was any way to avoid the filing of the bankruptcy and that they did not want her to leave. Ms. Foster told Elizondo that the petition was filed on the previous day. Elizondo told Ms. Foster that the Board was afraid that teachers would talk too much if she had filed for bankruptcy and he would have to get back with the Board.

On October 15, 2002, when Ms. Foster was given the termination letter she challenged Elizondo that the reasons stated had been manufactured. According to Ms. Foster, Elizondo agreed and admitted that the letter had been drafted after a meeting with a lawyer.

Taken in the light most favorable to the Fosters, the facts of record could show that the decision to terminate Ms. Foster's employment was based solely on the bankruptcy filing. The Fosters have satisfied their burden. Defendants' motion for summary judgment should be denied as to the Section 525(b) claim.

### C. Whether Defendants are entitled to summary judgment on the retaliatory discharge claim.

The Fosters allege that Defendants are liable for retaliatory discharge with regard to Ms. Foster's termination. Defendants argue that they are entitled to summary judgment on this claim because the bankruptcy filing did not further public policy and the claim is barred because §525(b) provides an alternative remedy. The Fosters assert that the public policy of the bankruptcy code supports her retaliatory discharge claim.

New Mexico substantive law applies to this supplemental jurisdiction claim. *See BankOklahoma Mortgage Corp. v. Capital Title Co.,* 194 F.3d 1089, 1103 (10th Cir. 1999). Under New Mexico law, the tort of retaliatory discharge represents a public policy exception to the traditional at-will employment rule. *Vigil v. Arzola*, 102 N.M. 682, 686-90, 699 P.2d 613, 617-21 (Ct. App.1983), *rev'd in part on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984), *overruled in part on other grounds by Chavez v. Manville Prods. Corp.*, 108 N.M. 643, 649, 777 P.2d 371, 377 (1989). "The linchpin of a cause of action for retaliatory discharge is whether by discharging the complaining employee the employer violated a clear mandate of public policy." *Shovelin v. Central New Mexico Electric Coop., Inc.*,115 N. M. 293, 303, 850 P. 2d 996, 1006 (1993). The plaintiff must further demonstrate a sufficient nexus between the asserted public policy and the discharge. *Id.*

Defendants argue that they are entitled to judgment as a matter of law because the Fosters' bankruptcy filing did not further public policy. The cases cited by Defendants involve whistle blowing by an employee. When an employee is allegedly discharged for whistle blowing, the employee must show that her actions were not "merely private or proprietary," but rather, were undertaken to "further the public good." *Gutierrez v. Sundancer Indian Jewelry, Inc.*, 117 N.M. 41, 48, 868 P.2d

10

1266, 1273 (Ct. App.1993) (citation omitted); *accord Garrity v. Overland Sheepskin Co.*, 121 N.M. 710, 917 P.2d 1382 (1996). The Fosters do not allege that Ms. Foster was terminated for whistle blowing; they allege that she was fired solely because she sought the protections of the bankruptcy code.

A retaliatory discharge claim may be based on public policy mandates set out in statutes that also protect private interests. *See Gandy v. Wal-Mart Stores, Inc.*, 117 N.M. 441, 445, 872 P.2d 859, 863 (1994) (holding that retaliatory discharge may be based on a violation of one of the public policy mandates set out in New Mexico Human Rights Act); *Michaels v. Anglo American Auto Auctions, Inc.*, 117 N.M. 91, 93, 869 P.2d 279, 281 (1994) (holding that workers' compensation act did not preclude a separate lawsuit in tort). Defendants' argument that they are entitled to summary judgment on the retaliatory discharge claim because the bankruptcy filing furthered private, rather than a public, interest is unavailing.

Defendants' argument that the existence of an alternative remedy bars a claim for retaliatory discharge is similarly unsupported. *See Gandy*, 117 N.M. at 445-446, 872 P.2d at 863-864 (1994) (holding that existence of remedy under New Mexico Human Rights Act did not preclude retaliatory discharge claim); *Michaels*, 117 N.M. at 93, 869 P.2d at 281 (comparing severe limitations on relief available under workers' compensation statutes with relief possible from the tort of retaliatory discharge and holding that the former did not bar a separate lawsuit in tort). The cases demonstrate that the availability of a remedy under §525(b) does not bar the retaliatory discharge claim under New Mexico law.

Taken in the light most favorable to the Fosters, the facts of record could show that the decision to terminate Ms. Foster's employment was based on the Fosters' decision to seek the

11

protections of the bankruptcy code. Defendants have not shown that they are entitled to judgment as a matter of law on the retaliatory discharge claim.

### D. Whether Defendants are entitled to summary judgment on the civil conspiracy claim.

In Count III, the Fosters advance a claim for civil conspiracy based on an alleged agreement to commit the tort of retaliatory discharge. (Comp. ¶¶ 17-18.) Defendants contend that they are entitled to summary judgment on this claim because the Fosters cannot prove a retaliatory discharge claim and the civil conspiracy claim is barred by the intracorporate conspiracy rule.

New Mexico substantive law applies to this supplemental jurisdiction claim. *BankOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d at 1103. To establish civil conspiracy under New Mexico law, a plaintiff must prove: (1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts. *Ettenson v. Burke*, 130 N.M. 67, 72, 17 P.3d 440, 445 (Ct. App. 2000). Ms. Foster may be able to prove retaliatory discharge and resultant damages. Her deposition testimony indicates that Defendants agreed to fire her at the special board meeting solely because of her bankruptcy filing. If Ms. Foster's testimony is accepted as true, a jury could find that Defendants engaged in a civil conspiracy.

Defendants' authorities concerning the intracorporate conspiracy rule do not rely on New Mexico law. In New Mexico, a civil conspiracy claim may arise where a supervisor engages in the tort of interference with contractual relations owed by the corporation to the employee. *See Ettenson*, 130 N.M. at 72-73, 17 P.3d at 445-446. Taken in the light most favorable to the Fosters, the facts of record could establish a civil conspiracy. Defendants have not shown that they are

12

entitled to judgment as a matter of law on the civil conspiracy claim.

### E. Whether Defendants are entitled to summary judgment on the loss of consortium claim.

In Count IV, the Fosters allege that Mr. Foster is entitled to damages for loss of consortium. Loss of consortium is the emotional distress suffered by a person who loses the normal company of another person with whom he or she has an intimate, familiar relationship when the other person is physically injured due to the tortious conduct of another. *Lozoya v. Sanchez*, 133 N.M. 579, 589, 66 P.3d 948, 958 (2003). Damages for loss of consortium are contingent upon the injured person's entitlement to general damages. *Archer v. Roadrunner Trucking, Inc.*, 122 N.M. 703, 708, 930 P.2d 1155, 1160 (1997).

The Fosters have not alleged that Ms. Foster was physically injured and Ms. Foster is not entitled to general damages. Indeed, the Fosters concede that New Mexico law does not support a loss of consortium claim by Mr. Foster. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 19.) Therefore, Defendants are entitled to summary judgment on Count IV.

WHEREFORE,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 42), filed June 28, 2004, is **DENIED AS TO COUNTS I, II, AND III, AND GRANTED AS TO COUNT IV**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**